Richard DRAYTON, John R. Sauerteig, and Sydney G. Stevens, as escrow agents of the Delaware & Bound Brook Railroad Company, Appellees,

v.

UNITED STATES of America, Appellant.

No. 85–5432.

United States Court of Appeals, Third Circuit.

Argued April 14, 1986.

Decided Sept. 11, 1986.

Rehearing and Rehearing In Banc Denied Oct. 7, 1986.

John N. Malyska (argued), Henry T. Benedetto, Kathryn M. Schatz-Koles, Meyner & Landis, Newark, N.J., for appellees.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Jonathan S. Cohen, John A. Dudeck, Jr. (argued), Attys. Tax Div., U.S. Dept. of Justice, Washington, D.C., (Thomas W. Greelish, U.S. Atty., of counsel), for appellant.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This income tax case arises in the aftermath of the Rail Reorganization Act. Before us on an appeal from the judgment of the district court in a tax refund suit, it requires us to determine the proper income tax treatment of the interest component of certificates of value delivered to the shareholders of the transferor railroads as compensation for their properties. The district court ruled that the interest component was non-taxable pursuant to 26 U.S.C. § 374(c) (1982). We disagree, however, and hold that the income is fully taxable as

ordinary income. Hence, we shall reverse the district court's grant of summary judgment and instruct the court to enter a summary judgment for the government.

## I. THE STATUTORY FRAMEWORK

### A. *The Rail Act through* Blanchette

By the late 1960's and early 1970's eight railroads in the northeast and midwest sections of the country had fallen on hard times. Experiencing both physical and financial deterioration, they filed petitions for bankruptcy and began to undergo reorganizations in the bankruptcy courts. However, Congress superseded the reorganization process when it passed the Regional Rail Reorganization Act of 1973, Pub.L. No. 93–236, 87 Stat. 985 (1974), 45 U.S.C. § 701 *et seq.* (the Rail Act) (*amended* 1976, 1981) a comprehensive effort to save the nation's railway system through a combination of public agencies and private initiative.

The Rail Act established a government corporation, the United States Railway Association (USRA), 45 U.S.C. § 711(a) (1982), which was to develop a Final System Plan for restructuring the railroads into a "financially self-sustaining rail service system." 45 U.S.C. § 716(a)(1) (1982). The Final System Plan was to provide for the transfer of certain of the properties of the bankrupt railroads to a private railroad incorporated by the federal government, the Consolidated Rail Corporation (Conrail). Pub.L. 93–236, Title III § 301, 87 Stat. 1004 (1974), *codified at* 45 U.S.C. § 741 (1982). In exchange, the railroads whose properties were taken were to receive common and preferred Conrail stock, plus up to $500 million of USRA obligations guaranteed by the United States. Pub.L. 93–236, Title II, § 206(d)(1), 87 Stat. 994 (1974), *codified at* 45 U.S.C. § 716(d)(1) (1982); *see also* Pub.L. No. 93–236, Title II § 210, 87 Stat. 1000 (1974), *codified at* 45 U.S.C. § 720 (1982) (*amended* 1980).

In July, 1975, the USRA duly submitted its Final System Plan to Congress, which acquiesced to the plan by not disapproving it within sixty days of its submission.

Pub.L. No. 93–236, Title II, § 208, 87 Stat. 999 (1974) *codified at* 45 U.S.C. § 718 (1982). USRA then submitted all of the Conrail securities and the requisite number of USRA obligations to a Special Court created by the Rail Act, Pub.L. No. 93–236, Title II, § 209, 87 Stat. 999 (1974), *codified at* 45 U.S.C. § 719(b) (1982).

The Special Court was assigned two primary tasks. First, it was to "order the trustee or trustees of each railroad in reorganization ... to convey forthwith [to Conrail] ... all right title and interest in the rail properties of such railroad in reorganization [as designated in the Final System Plan]," Pub.L. 93–236, Title III, § 303, 87 Stat. 1005 (1974), *codified at* 45 U.S.C. § 743(b) (1982). Second, railroads whose assets were transferred to Conrail and which were dissatisfied with the compensation allotted to them by USRA could file complaints before the Special Court, which had the power to determine whether the Conrail securities and the USRA bonds that the railways were to receive as compensation for their properties that had been taken by the government satisfied the constitutional minimum. The Special Court was to adjust the compensation if it determined that it was either too high or too low. *See* 45 U.S.C. § 743(c) (Special Court to assure that transferor railroads receive "fair and equitable" value for their rail properties and that they receive no less than the constitutional minimum).

The bankrupt railroads' major creditors challenged the constitutionality of the Rail Act almost immediately. They argued *inter alia* that the act was an unjustifiable taking without just compensation. In the compendious *Blanchette v. Connecticut General Insurance Corps.*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), the Supreme Court upheld the constitutionality of the Rail Act against a variety of constitutional challenges. In responding to the just compensation challenge, the Court stated that because the Tucker Act, 28 U.S.C. § 1491 (1982), was available to aggrieved transferors, enabling them to challenge their allotted compensation in the

United States Claims Court, there was no unjust compensation problem. *Id.* 419 U.S. at 148–49, 95 S.Ct. at 361.

## B. *Congressional Response to* Blanchette

In the wake of *Blanchette,* Congress was faced with the spectre of Tucker Act suits by virtually every creditor of the defunct railroads whose properties were to become part of the Conrail system. To avoid the confusion and uncertainty that would ensue if such suits were allowed, Congress amended the Rail Act in the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31 (1976), (the Reform Act), *codified in* 45 U.S.C. § 801 et seq. (1982), which changed the manner of compensating the transferor railways. Instead of simply putting Conrail securities into the Special Court's coffers, the Reform Act required Conrail to deposit with the Special Court securities *and* Certificates of Value (CVs), issued by the USRA. Pub.L. No. 94–210, Title VI, § 610(b), 90 Stat. 101, 104 (1976), *codified at* 45 U.S.C. § 746 (1986). The CVs, which are debt instruments, were designed to give the Special Court some flexibility in compensating the transferors, so that the Tucker Act suits could be avoided. Because CVs are at the heart of this case, it is necessary to discuss them in some detail.

According to the Reform Act, each transferor of rail properties was to receive a separate "series" of CVs. Each transferor would get as many CVs as it did shares of series B preferred Conrail stock in exchange for its properties. 45 U.S.C. § 746(b). Although the CVs paid no interest or dividend, they were guaranteed by the USRA and redeemable by the USRA on December 31, 1987, or at such earlier time as the USRA might determine. 45 U.S.C. § 746(c). Each CV had a *base value* that was determined as follows:

(A) take the net liquidation value of a transferor's assets, as calculated by the Special Court;

(B) subtract the value of other benefits already provided to the transferor under the Rail Act;

(C) add any amount required to compensate for "unconstitutional erosion" that had occurred during the bankruptcy proceedings;

(D) add 8% interest from the date the assets were transferred to ConRail to the date the CV is redeemed; and,

(E) divide the resultant value by the number of CV's distributed to the transferor.

45 U.S.C. § 746(c)(4).[1] Base value is important because it is used to determine redemption value: redemption value of a CV equals its base value on the redemption date; minus (A) the sum of the fair market

---

1. The text is a paraphrase of § 746(c)(4), which reads in its entirety as follows:

The base value of each certificate of value of any series shall be the value obtained by (A) taking the net liquidation value, as determined by the special court, to which the transferor to whom such series of certificates of value is issued is entitled by virtue of transfers of rail properties, under section 743(b)(1) of this title to the Corporation or a subsidiary thereof; (B) subtracting the value of other benefits provided under this chapter, as determined by the special court; (C) adding such amount, if any, as the special court may determine shall be required after taking into consideration compensable unconstitutional erosion, if any, in the estate of a railroad in reorganization, or of a railroad leased, operated, or controlled by such a railroad, which the special court finds to have occurred during any bankruptcy proceeding with respect to

such railroad; (D) adding interest from the transfer date to the redemption date to be compounded annually at a rate of 8 percent per annum; and (E) dividing the resulting value by the number of certificates of value of such series distributed to such transferor. In determining such base value, the special court shall give due weight and consideration to the finding of the Association as to the net liquidation value to which each transferor is entitled by virtue of conveyances of rail properties under section 743(b)(1) of this title. For purposes of this paragraph, the term "rail properties" includes all rights with respect to employee benefit plans transferred and assigned to the corporation pursuant to section 743(b)(6) of this title. Net liquidation value with respect to such rights shall be determined after taking into account all obligations finally transferred or assigned to the Corporation pursuant to such section.

value of the series B preferred stock and common stock and all dividends paid on that stock, and; (B) any other sums paid the transferor for its assets; divided by the number of CVs distributed to the transferor. 45 U.S.C. § 764(c)(2). *See also In the Matter of Valuation Proceedings Under Sections 303(c) and 306 of the Regional Rail Reorganization Act,* 425 F.Supp. 266, 276 (Special Court, 1976).

As a result of this formula, the CVs were "adjusters," for their redemption price was, by definition, the difference between liquidation value of the transferor's assets and the value of any other compensation given to the transferor. The CVs were intended to fill any gap in compensation caused by the low value of Conrail stock and USRA bonds. They were designed to ensure that all transferors received their constitutional due, so that there would be no Tucker Act suits against the United States.

At the same time that Congress passed the Reform Act, it also passed the Act of March 31, 1976, Pub.L. No. 94–253, 90 Stat. 295 (1976), which added 26 U.S.C. § 374(c) to the Internal Revenue Code. Section 374(c)(1) provides:

> No gain or loss shall be recognized if, in order to carry out the final system plan, rail properties of a transferor railroad corporation are transferred to the Consolidated Rail Corporation (or any subsidiary thereof) pursuant to an order of the special court ... in exchange solely for stock of [Conrail], certificates of value of the [USRA], or any combination thereof.

### C. *Conrail's Performance from 1976 through 1981*

Conrail's performance in the second half of the decade of its birth did not meet expectations. Instead of gradually decreasing its reliance on federal assistance and loans, Conrail grew ever more dependent on federal help, and its stock remained virtually valueless. In August, 1981, in response to this poor performance, Congress amended the Rail Act for the second time relevant to this suit. This amend-

ment, Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 357, 643 (1981) (Omnibus Reconciliation Act), *codified at* 45 U.S.C. § 1115 (1982), stated that "[f]or the purpose of computing the amount for which certificates of value shall be redeemable under § 746" all series B preferred and common stock that had been intended as consideration for the transferors' property was to be deemed to be without fair market value. As a result of the Omnibus Reconciliation Act, CVs, which had originally been intended as "gap fillers" between the value of the Conrail stock and the liquidated value of the transferred property, became the sole source of payment from Conrail to the transferor railroads.

## II. HISTORY OF THIS CASE

The factual background of this case stems from the time when railroads were in their heyday and faith in their future was unbounded. Plaintiffs-appellees are escrow agents for Delaware and Bound Brook Railway Company ("D & BB") which, in 1879, leased all of its rail properties to the Reading Company for 990 years. Almost 100 years later, in 1973, the Reading Company was one of the major northeast railroads that went into bankruptcy. Although D & BB was solvent, the Final System Plan adopted by USRA encompassed its property too, because of D & BB's long-term lease with the bankrupt Reading Company. Pursuant to the Final System Plan, D & BB's property was transferred to Conrail on April 1, 1976. Conrail stock and CVs were deposited with the Special Court until the value of D & BB's assets could be calculated.

USRA assessed the value of D & BB's contribution as approximately $1,150,000. App. at 10 (Malyska affidavit). Arguing that this figure was too low, D & BB filed a complaint with the Special Court, as was its right. In August, 1981, shortly after the Omnibus Reconciliation Act was passed, and while the suit was still before the Special Court, D & BB and USRA entered into a settlement agreement, a condi-

tion of which was that D & BB's stockholders adopt a complete plan of liquidation pursuant to 26 U.S.C. § 337.[2] The shareholders adopted a satisfactory plan in September, 1981.

In accordance with the settlement agreement, D & BB received CVs worth $6,802,-660. This figure was arrived at by following the procedure prescribed in 45 U.S.C. § 746(c)(4), *see supra* at 6 (outlining procedure) and n. 1 (text of § 746(c)(4)). Specifically, the figure was arrived at as follows: the parties agreed that the net liquidation value of D & BB's rail properties on April 1, 1976 was $4,408,417, *see* 45 U.S.C. § 746(c)(4)(A); they agreed that there had been no other benefits conferred, and that there was no compensation necessary for "unconstitutional erosion," *see* 45 U.S.C. 746(c)(4)(B), (C); they computed 8% annual interest on the net liquidation figure from April 1, 1976, the date the assets were transferred to Conrail, *see* 45 U.S.C. § 746(c)(4)(D); and, finally, they calculated the sum of the net liquidation value and the interest, *id.* Because the interest figure was $2,394,243, the sum of the interest and the liquidation value was $6,802,660.

USRA redeemed the CVs almost immediately for the full $6,802,660. D & BB thereupon liquidated pursuant to 26 U.S.C. § 337, its shareholders receiving *pro rata* shares of the proceeds. D & BB dissolved on December 31, 1981. A reasonable amount was left in a liquidation trust for payment of contingent obligations.

Thereupon, D & BB sought a private letter ruling from the IRS concerning the tax treatment of the interest component of the CVs. D & BB submitted that the interest component was a return on capital and therefore should be taxed as a capital gain.

The IRS disagreed, however, and stated that the interest was not from the sale of assets but was ordinary income whose tax treatment was governed by 26 U.S.C. § 61(a) (1982). *See* Appellant's Appendix at 31–32 (IRS letter ruling of May 14, 1982).

D & BB then sought a second letter ruling, this time arguing that since the redemption was a sale pursuant to a § 337 liquidation, there should be no recognition of the gain and no taxation. *See supra* n. 2. Once again, however, the IRS ruled against D & BB, stating that although the liquidation had followed all the requirements of § 337, the non-recognition treatment would not be extended to the 8% increment because that increment "did not constitute proceeds from the sale or exchange of a capital asset," but was simply interest income, which is taxed even if received during the course of a § 337 liquidation. *See* Appellant's Appendix at 33–36 (IRS letter ruling of July 13, 1982).

On September 9, 1982, D & BB filed its federal corporate income tax form for 1981. In compliance with the letter rulings, D & BB reported interest income of $1,195,728,[3] on which it paid a tax of $545,153. On December 9, 1983, however, D & BB filed an amended return, claiming that the interest component should not have been taxed at all. Unmoved, the IRS continued to treat the interest as ordinary income.

D & BB thereupon filed a suit in the federal district court for the District of New Jersey seeking a refund. The government moved to dismiss and D & BB filed a cross-motion for summary judgment. As explained by the district court, the cross-motions focused on a single issue:

**2.** Section 337 states that if a corporation distributes all of its assets within twelve months after adopting a complete plan of liquidation, no gain or loss will be recognized on any sales or exchanges of its property during that period. The statute reads, in relevant part, as follows:

(a) General rule.—If, within a 12–month period beginning on the date on which a corporation adopts a plan of complete liquidation, all of the assets of the corporation are distributed

in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12–month period.

**3.** This is D & BB's share of the total interest on the CVs paid by Conrail. The remainder was attributed to lessee Reading Company. The attribution is not in question here.

whether the interest received by D & BB represents an amount in excess of the value of its assets, or whether the interest is, pursuant to 45 U.S.C. § 746(c)(4), a component of the actual value of the assets, and therefore not interest at all. App. at 125.

After hearing argument, the district court denied the government's motion to dismiss and granted summary judgment for D & BB, 632 F.Supp. 95. According to the court's analysis, the critical question was whether the interest was intended as (i) an element of base value, or (ii) an excess over value, payable presumably for the period between the seizure of the rail property on April 1, 1976 and the redemption of the CVs. If the interest were an element of base value, then, the district court felt, § 374(c) protected it from taxation; if the interest were an excess over base value, then it would be taxed as ordinary income. *See* App. at 127–28.

After describing the issue in these terms, the court decided that the interest provided for by statute was "a component of the base value of the certificates of value.... The interest component is thus an integral part of the redemption, or base, value for rail properties, and is not an amount in excess of the value of such properties." *Id.* at 130. Thus, it concluded, "[u]nder the express provisions of § 374(c) the aggregate sum received should result in no tax consequences to D & BB." *Id.*[4] The court thus ordered the IRS to refund the full amount of the $545,153 to D & BB.

The government appealed. Because the case involves solely questions of law, our scope of review is plenary.

## III. DISCUSSION

Although the papers are not entirely clear on the point, it appears that D & BB

---

**4.** *See also* App. at 127:

[T]he Rail Acts of 1973 and 1976 were complex acts enacted to deal with a crisis in rail transportation. The 1976 Rail Act established formulas for ensuring that railroads that turned over their property to Conrail received the constitutional minimum for that property.

has essentially two theories according to which it should not be taxed on the 8% interest component. The first theory is simply that § 374(c) in terms proscribes taxation of any income received upon the redemption of the CVs. The second theory is that the 8% interest component is capital gain that by virtue of § 337 is non-taxable. Although the district court relied on the former theory, D & BB presents both here, and we consider them both. We then address two arguments presented by D & BB for limited taxation.

### A. *The Relevance of Section 374(c)*

■ D & BB argues that 26 U.S.C. § 374(c) (1982) controls this case because of its instruction that the exchange of rail properties for Conrail securities and CVs is not a recognition event. Since non-recognition events cannot give rise to taxation, D & BB argues, the clear import of § 374(c) is that there can be no taxation on any part of the CVs received from Conrail, even on interest. Appellee's Br. at 13–14. The district court also relied on this statutory provision in finding for D & BB. *See supra* at 13.

Despite the district court's reliance on it, we believe that § 374(c) is not relevant to the issue in this case. Section 374(c) provides non-recognition treatment for the *exchange* of the railway property for the Conrail securities and CVs. However, we are concerned here not with the exchange of D & BB's assets for CVs but with the subsequent *redemption* of the CVs by the USRS. The exchange in this case which took place before the redemption, was not taxed. Redemption is a wholly different transaction from the initial exchange of property for securities, and § 374(c) does not pertain to it. Section 374(c) rendered only the exchange non-taxable, and cannot help taxpayer any more.

*The fact that interest is included as a factor in a formula for determining the base value of the USRA certificate of value, means that the interest factor cannot simply be assumed to represent an excess over the value of the property....*

(emphasis supplied).

B. *Characterization of the 8% Interest Component*

 The parties agree that if the 8% interest component is treated as capital gain, it is not taxable on account of § 337. Their disagreement centers on whether the component is ordinary income or capital gain. We believe that the interest is ordinary income for two principal reasons. The first involves literal statutory construction. Section 61(a)(4) of the Internal Revenue Code, 26 U.S.C. § 61(a)(4) (1982), states that interest income is taxable as ordinary income. The Supreme Court has stated that that section is to be broadly construed, and all exemptions from it construed narrowly. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429–30, 75 S.Ct. 473, 475–76, 99 L.Ed. 483 (1955). The plain language of 45 U.S.C. § 746(c)(4) (quoted *supra* n. 1), which defines the value of CVs, expressly uses the term "interest" without qualification. On account of the express terms of 26 U.S.C. § 61(a)(4) and 45 U.S.C. § 746(c)(4), and the pertinent rules of statutory construction, the interest component of CVs must be treated as ordinary income and are fully taxable.

The second reason for treating the interest component as ordinary income is more analytic, but it is closely related to the first reason. This argument takes as its starting point the definition of interest: "compensation allowed by law or fixed by the parties for use, or forbearance, *or detention, or money.*" *Fall River Electric Light Co. v. Commissioner*, 23 B.T.A. 168, 171 (1931) (emphasis added). It is clear that if Conrail had issued the CVs and redeemed them on April 1, 1976, the day it took control of the rail property, there would be no payment based on the 8% interest calculation for the interest was to be calculated from the date on which the assets were transferred to the date on which the CVs were redeemed. Thus the "interest income" in this case is simply payment for the detention of money and falls squarely within the standard definition of interest. Because all other interest is taxed as ordinary income, this interest should be, too.

Strong support for this line of reasoning is found in *Kieselbach v. Commissioner*, 317 U.S. 399, 63 S.Ct. 303, 87 L.Ed. 358 (1943). *Kieselbach* involved a New York law that granted property owners whose property had been condemned interest from the date the city took title to the date of payment "as part of the compensation to which such owners are entitled." The Supreme Court held that the interest was ordinary income under the predecessor of § 61(a):

> [T]hese [interest] payments are indemnification for delay, not a part of the sale price. While without their payment just compensation would not be received by the vendor, it does not follow that the additional payments are a part of the sale price under § 117(a). The just compensation constitutionally required is not the same thing as the sale price of a capital asset.

317 U.S. at 404, 63 S.Ct. 305. The point of *Kieselbach* is that even though it was constitutionally required ("[w]hile without their payment, just compensation would not be received by the vendor"), the interest was not part of the sale price of the capital asset, but was fully taxable as ordinary income. That is exactly the case here: although the interest may have been constitutionally required, as the district court found, *see supra* at 13–14 & n. 4, it is nonetheless interest income that must be taxed as ordinary income.

D & BB offers several arguments against this position. Although some of them are strong, we find none of them sufficient to overcome the weight of the arguments just considered.[5]

---

5. In addition to the arguments addressed in the text, D & BB made two other arguments. First, D & BB argued that the interest component of the CV could not be taxed differently from the rest of the CV because the interest component was an "integral part" of the CV, and thus distinguishable from standard instances of interest in which the money paid is added on at the end. Appellee's Br. at 14–22. At its root, the argument is that the fact that interest is part of the

First, D & BB notes that it is entitled to 8% interest on the net liquidation value of the assets it gave to Conrail, compounded annually. It further notes that the 8% is calculated from that net liquidation value, *regardless of what other payments taxpayer may get from Conrail. See* supra at 6 (paraphrasing 45 U.S.C. § 746(c)(4)). Thus, it concludes, the interest cannot represent payment for the detention of money, for it is calculated without regard to the precise amount of money D & BB has in fact "lent" the government. Therefore, says D & BB, the term "interest" income is a misnomer for this component of the CVs, for the 8% is in fact a measure of the appreciation of the capital seized by the government. Appellee's Br. at 22. Hence, D & BB argues, the 8% falls under the § 337 prohibition against taxation.

D & BB's initial observation is correct: if the interest figure is intended to be payment for the detention of the transferor railroads' money, then it is incorrectly calculated because it does not take into account all transfers from Conrail to the transferors that might occur between the date the transferor gets its CVs and the redemption date. Despite the technical correctness of this point, we are not persuaded that it is sufficient to overcome the argu-

ments in favor of taxing the interest components of the CVs as ordinary income. In the first place, taxpayer's alternative explanation for the 8% payment has a fatal flaw. The transferred rail property presumably *depreciated,* rather than appreciated, between the time it was transferred and the redemption date. It thus makes little sense to speak of capital appreciation in this context.

Moreover, even a sympathetic reinterpretation of D & BB's argument does not lead to the conclusion urged upon us by D & BB. One might interpret D & BB's reference to the 8% component as "capital appreciation" to mean that the 8% payment was intended as a substitute for the estimated profit that D & BB would have realized had the property remained in the hands of the Reading Company, D & BB's lessee. The 8% would not then represent "capital appreciation," as that term is generally used, but would represent a substitute for the profit that the capital would have created. Although this interpretation avoids the problem of the depreciation of capital assets that we have just noted, it still does not lead to the conclusion that the 8% payment should be treated as other than ordinary income. The actual profits

definition of base value implies that Congress intended it to be "an inherent and inseparable part" of the CVs, *id.* at 15, and that because the CVs are exchanged for capital goods, the entirety of the CVs must be treated as proceeds from the sale of capital goods. The argument relies on the unspoken premise that a court should not treat different components of the CVs differently.

Stating the premise reveals its weakness. There is no general, jurisprudential ground supporting the proposition that a court should not divide awards into their component parts. The *Kieselbach* Court did precisely that, treating part of the compensation price as return on capital and part as interest (ordinary income). Surely Congress could have instructed that the interest component of the CVs be treated as return on capital. It did not, however, choose to do so.

D & BB's other argument that is not addressed in the text begins with the proposition that it is unfair to have different tax consequences hinge upon the form of payment received, especially when that form is beyond the control of the taxpayer. Appellee's Br. at

22–25. Taxpayer then observes that if it had been paid in Conrail stock, as was originally intended, *see supra* at 120–21, it would have had no ordinary income. Thus, taxpayer concludes, the mere fact that it has not been paid in Conrail stock but has instead received CVs should not change the fact that it has not received, and should not be taxed on, ordinary income. Appellee's Br. at 22–25. We disagree with the initial proposition of this argument. The tax consequences of a transaction will almost always depend upon whether the payment received is in the form of debt or equity, and the form of payment is often out of the hands of the recipient (as, for example, in large corporate transactions where small shareholders have little say about whether they will receive debt or equity instruments). Granted, from D & BB's perspective it is *unfortunate* that D & BB is burdened by heavier tax consequences on account of being paid in CVs rather than in Conrail stock, but, because D & BB never had a right to payment in Conrail stock, *see infra* at 129, we find nothing unfair about this circumstance.

that D & BB would have made had its property not been transferred would be taxed as ordinary income, and it stands to reason that the substitutes for those profits should be taxed in the same way. Thus, even under this interpretation, we do not reach the conclusion that the 8% payment should be treated as a return on capital.

We are thus left with an 8% figure that does not fit neatly into any category of income. Given this imprecision, we are inclined to think that, despite the problem correctly noted by taxpayer, the 8% figure is best treated as ordinary interest. The statute consistently referred to it as such, and that seems to be persuasive evidence that Congress intended it to be treated as ordinary interest. Most likely, Congress simply wanted to keep the calculations simple, and thus ignored the complications that would have arisen if it had insisted that the interest figure take into account the putative payments[6] from Conrail to the transferor railroad during the period between distribution of CVs and the redemption date. The mere fact that the interest component was not computed with scientific precision does not outweigh the strong evidence in favor of treating this amount as ordinary interest.

D & BB's second argument is that although *Kieselbach* would control if the Rail Act and the subsequent statutes that amended it were *condemnation* statutes— ones under which the government seizes property for a public use and is required to pay just compensation—the Rail Act was not a condemnation statute but a *reorganization* (bankruptcy) statute, promulgated pursuant to the Congress' bankruptcy power, rather than its condemnation power,

and therefore that an entirely different analysis applies. *See* Appellee's Br. at 33–39. According to D & BB, because the Rail Act is a reorganization statute, the interest component of the CVs is "boot" which is taxed only to the extent of gain realized, and the nature of the gain—ordinary income or capital gain—is determined by the nature of the assets for which the boot was received.[7] Because in this case the transferred assets were capital goods, D & BB argues, the interest is a capital asset, and the gain attributable to the interest is cancelled by the § 337 distribution, *see supra* n. 2 (discussing § 337).

D & BB relies on *Blanchette v. Connecticut General Insurance Corps.*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), for the proposition that the Rail Act is not a condemnation statute but a reorganization statute. In *Blanchette*, the Court was presented with the question whether the Rail Act worked an unjustifiable taking without just compensation. Although the Court engaged in a careful discussion suggesting that the Rail Act's scheme of compensation satisfied the requirements of the eminent domain power, *see id.* at 149–51, 95 S.Ct. at 361–62, it did not rest on that line of reasoning. Instead, the Court concluded that the question was merely academic, for "the arguments in favor of [characterizing the Rail Act as an eminent domain statute] have no merit," *id.* at 152, 95 S.Ct. at 363. Instead, the Court found that the Rail Act was an exercise of Congress' powers under the bankruptcy clause, U.S. Const. Art. I. § 8, cl. 4.

While *Blanchette* would appear at first blush to be dispositive in D & BB's favor, a closer look at the Court's analysis of the

---

**6.** It is irrelevant that D & BB itself received no other payments from Conrail, for D & BB's argument is that the method of interest calculation reveals Congress' intent about the nature of the payments. That intent does not depend on the particular facts of this case.

**7.** When like-kind properties are exchanged, as in reorganization proceedings, each property's basis "carries over," and neither gain nor loss is recognized on the transaction. *See* 26 U.S.C. §§ 1031 (like kind exchanges), 354 (corporate

reorganizations). If one party to a like-king exchange also contributes some other property, then that property is alled "boot." The person who receives the boot recognizes gain (if any) only to the extent of the boot. *See id.* The character of the underlying property transferred in the like exchange, not the character of the boot, determines the character (capital or ordinary) of the gain. *See* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders 3–21—3–22 (1979).

issue suggests that this is not so. The Court gave three reasons for its determination that the Rail Act was a reorganization rather than a condemnation statute: (1) Conrail was to be "basically a private, not a governmental, enterprise," *id.* at 152, 95 S.Ct. at 363; (2) that the Rail Act compelled the exchange of property did not disqualify it from being a reorganization statute, for cram-downs are forced exchanges, and they are authorized by the bankruptcy statute which is, clearly, an instance of Congress' powers under the bankruptcy clause, *id.* at 152–53, 95 S.Ct. at 363; and, (3) there were ample safeguards of judicial review to make this a reorganization statute, *id.* at 154, 95 S.Ct. at 364. Only the first of the *Blanchette* Court's reasons explains why the Rail Act must be a reorganization statute and cannot be a condemnation statute. The second and third parts are simply reasons that the Rail Act *is not disqualified from being* a reorganization statute; obviously, they do not disqualify the Rail Act from also being a condemnation statute. The controlling power of the *Blanchette* Court's characterization of the Rail Act

therefore depends upon the first part of the explanation. However, the first part of the explanation is no longer true: as noted above, the plans for a private Conrail failed. In response to that failure, Congress passed the Omnibus Reconciliation Act, under which Conrail is, and has been at least since that act, primarily a governmental enterprise. It is thus open to doubt that *Blanchette* controls on this point today.[8]

We need not decide this question, for even assuming that the Rail Act is indeed a reorganization statute rather than a condemnation statute, we are not persuaded that the treatment of the interest should be any different under the one than under the other. *Kieselbach's* holding that any money paid for delay on payment—even money that is constitutionally required—is fully taxable as interest did not depend upon the nature of the underlying statute as a condemnation statute. *Kieselbach* is thus on all fours with this case, and controls it, regardless of whether the Rail Act is characterized as a condemnation statute or a reorganization statute.[9]

---

**8.** Even before the Omnibus Reconciliation Act, the Special Court, the court most directly responsible for and experienced with carrying out the Rail Act, had expressed its discomfort with interpreting the Rail Act as belonging entirely to either the reorganization or the condemnation categories of statutes. Judge Friendly, speaking for the court, explained that the Rail Act "drew both on the bankruptcy power and on the authority of Congress to exercise eminent domain under the commerce power." *Norwich & Worcester Railroad Co. v. United States,* 408 F.Supp. 1398, 1404 (Special Court 1976) (Friendly, J.). The Omnibus Reconciliation Act only deepened the ambiguity concerning the nature of the Rail Act.

**9.** *Commissioner v. Carman,* 189 F.2d 263 (2d Cir.1951), relied upon by D & BB, is not to the contrary. In that case, the taxpayer had bought bonds of a corporation that filed a petition for reorganization in 1935 under the then-prevailing bankruptcy act. *Id.* at 364. Almost five years later, in 1939, a reorganization plan was approved by the district court. *Id.* Consummation of the plan was delayed for five more years by litigation, and it was not until December 29, 1944 that the plan finally went into effect. *Id.* On that date, the taxpayer surrendered his old bonds and received in return bonds, common and preferred stock in the reorganized corpora-

tion, and cash. *Id.* The cash was ordered by the district court as an "adjustment payment" to compensate the taxpayer for the five-year delay in the consummation of the plan from 1939 to 1944. *Id.* Although the tax court held that the "adjustment payment" was fully taxable as interest income (income for the detention of money), *id.,* the circuit court reversed, holding that the adjustment payment was payment " 'in pursuance of the plan of reorganization,' " *id.* at 365 (quoting 26 U.S.C. § 112(b)(3), which was the predecessor of 26 U.S.C. § 354), and was thus taxable as boot, and not as ordinary income.

D & BB argues that the lesson of *Carman* is that payment for the delay in a reorganization proceeding is necessarily boot, not interest, and urges us to treat the 8% interest component of the CVs in the same way. We decline to read *Carman* that broadly. The key to the *Carman* holding was that until the date when the reorganization plan was finally consummated, December 29, 1944, the taxpayer retained possession of his old bonds. The taxpayer had full control over the bonds during the period of litigation; he could have sold them or transferred them at will. Because there was no time-gap between the taxpayer's surrender of his bonds and his receipt of property in exchange for the bonds, treating

D & BB's third argument proceeds from an observation about the allocation of basis between Conrail securities and CVs, and the alleged inequities that might result from that allocation if D & BB cannot treat the 8% interest component as capital income. Basis is allocated between the CVs and the Conrail stock in direct proportion to their fair market values. Treas.Reg. 1.358–5. The fair market value of the CVs includes the value of the CVs attributable to the 8% interest. D & BB notes that because the 8% interest figure is included in the basis calculations the CVs will have a relatively larger basis attributed to them than will the Conrail stock. So long as that interest component is treated as ordinary income, D & BB warns, D & BB might realize (1) an excessive capital loss on the CVs, (2) an excessive capital gain on the stock, and (3) a large measure of ordinary income on the interest component. If the sale of the CVs and stock were sufficiently far apart, D & BB continues, the capital loss on the CVs could not be offset against the gain on the stock and could be offset only to a limited extent against the ordinary interest income. Appellee's Br. at 46–47. *See also* 26 U.S.C. §§ 1211, 1212 (1982) (governing treatment of capital losses). The net result could be a transaction in which D & BB loses money, and yet on which it is (a) taxed on ordinary income, and (b) it is left with a large, unuseable, capital loss. Only if the interest is treated as capital income, D & BB argues, will the inequitable result of the allocation of basis be avoided. Appellee's Br. at 47–48. (And, of course, if the interest component is treated as capital income, it will escape taxation entirely under § 337.)

the adjustment payment as interest would have been inappropriate. Here, by contrast, D & BB gave up all rights to its property in April, 1976, and there was a delay of several years between D & BB's surrender of assets and the receipt of consideration for those assets. The money attributable to the delay is properly treated as interest, for it falls squarely under the definition of interest, *see supra* at 124, as the adjustment payments in *Carman* did not.

D & BB's argument is unpersuasive because it is inconclusive.[10] Treating the interest component of the CVs as ordinary income may indeed result in an unuseable capital loss on the sales of the CVs and in ordinary income; it may, that is, result in taxation even though D & BB suffers a net loss on the transaction. This result is, however, a function of (1) the mechanical, ultimately arbitrary, rules concerning the length of time that one may carry over capital gains or losses, and (2) our tax system's differentiation between capital gains and losses on the one hand and ordinary gains and losses on the other. On account of the carry-over rules and differentiation between capital and ordinary income, it is frequently the case that some losses cannot be set off against certain gains, either because the losses occurred too far before the gains or because the losses belonged in the capital account whereas the gains did not. That this might have happened here cannot be determinative of our interpretation of the Rail Act.

## C. *D & BB's Arguments for Limited Taxation*

■ In addition to the arguments recounted above as to why D & BB should pay no tax on the redemption of the CVs, D & BB offers two arguments that apparently admit of some taxation, but less than that demanded by the government. In the first of these arguments D & BB points out that the 1973 and 1976 Acts clearly contemplated that transferor railways would have equity holdings in Conrail, and would not be creditors. Appellee's Br. at 25–28. D & BB lost its expectation of being a Conrail equity holder only on August 13, 1981,

10. We do not agree with the government's response to this argument that insofar as it has been clear since 1981 that transferor railroads would receive no stock, allocation of basis is a purely academic question. Gov.Rep.Br. at 9. The point of the taxpayer's argument is that the basis provision, Treas.Reg. 1.358–5, may provide evidence about how Congress thought about the taxability of the 8% interest, and that is precisely the question before us here. Therefore, even if the basis provision itself is not relevant, it may still guide our interpretation of the statute.

when the Omnibus Reconciliation 981 Act was passed. D & BB concludes that it became a creditor only on that date, and therefore can be taxed only for interest accruing after that date. Under this theory no interest that accrued before August 13, 1981 would be recognized. Appellee's Br. at 30.

D & BB effectively asks to be treated as if it held common and preferred Conrail stock, or had a right to hold such stock, until August 13, 1981, and then was forced to exchange its stock for CVs. However, D & BB did not hold anything before the Omnibus Reconciliation Act; it had only a claim to a certain amount of compensation in whatever form Congress saw fit to provide. Admittedly, until August 13, 1981, D & BB may have *expected* that it would receive equity instead of ordinary income, but it had no *right* to such payment. (There was no reliance on equity payment, for the exchange of assets was forcible.) D & BB thus mischaracterizes the effect of the Omnibus Reconciliation Act, which was simply a determination of the form of compensation D & BB would receive for its properties.

Another reason the argument fails is that on August 13, 1981, Conrail equity was virtually worthless. This means that even had the law not changed on August 13, 1981, Conrail would have received all CVs anyway. It is thus inaccurate to say that D & BB swapped equity for debt on August 13, 1981. The change in law simply ratified something that would at all events have happened.

■ Finally, D & BB argues that the "open transaction" rule is relevant to its case. According to this rule, first enunciated in *Burnet v. Logan*, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931), and subsequently modified by 26 U.S.C. §§ 453, 483, when a taxpayer receives goods over a period of time in exchange for some property, and the value of the goods to be received is not easily calculable, the taxpayer is taxed as he receives the goods, with the recovery of basis prorated over the term of the payment. The character of any gain

received is determined by the character of the property transferred. The taxpayer is thus not forced to approximate the total value of the stream of goods before he has received them. *See Burnet v. Logan, supra;* M. Chirelstein, *Federal Income Taxation* 244–48 (1982).

D & BB argues that its receipt of the CVs is akin to an open transaction because until November 1981 when received the CVs from the USRA, this was an open transaction, the value of the goods that D & BB was to receive not yet having been determined: "[a]ny gain which may be attributable to the D & BB from the 1976 transaction would be capital gain, deferred and not reportable until November 13, 1981 when the D & BB's receipt of the Certificates of Value had the effect of closing the transaction." Appellee's Br. at 44. Although D & BB does not explain the tax consequences of this analysis, it would appear that any interest that accrued before November 13, 1981 would be capital gain, and hence not taxed, whereas the income accruing after that date (a *de minimis* amount to be sure), would be taxed as ordinary income.

This analysis fails because there is no open transaction problem in this case. The open transaction doctrine concerns the taxability of payments when those payments will continue over a long period and when the total is unknowable. *See id.* Here, by contrast, the redemption of the CVs was the first and final payment from the government to D & BB. It was definite and calculable, and the government did not attempt to tax D & BB for any income that it might receive in the future. It is irrelevant that the value D & BB would receive was not known on April 1, 1976, when D & BB transferred its property to the USRA, for the government did not try to tax D & BB until D & BB had received full compensation for its transferred rail properties. Open transaction analysis is therefore inappropriate here, and D & BB's final argument must also be rejected.

## IV. CONCLUSION

As the foregoing discussion makes clear, D & BB's counsel has presented us with a number of sophisticated challenges to the government's position. For the reasons stated above, however, we find that the interest income of approximately one million dollars received by D & BB on the redemption of its CVs should be taxed as ordinary income. The judgment of the district court will therefore be reversed, and an order entered directing the district court to enter judgment for the government.