Brian K. BRINKLEY, Petitioner–Appellant

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 15–60144.

United States Court of Appeals, Fifth Circuit.

Dec. 16, 2015.

William R. Leighton (argued), Leighton Law Firm, P.L.L.C., Austin, TX, for Petitioner–Appellant.

Randolph Lyons Hutter, Esq. (argued), Richard Bradshaw Farber, Esq., Supervi-

sory Attorney, Bethany Buck Hauser, Esq., Kathryn Keneally, U.S. Department of Justice, William J. Wilkins, Internal Revenue Service, Washington, DC, Sheila R. Pattison, Roberta L. Shumway, Austin, TX, for Respondent–Appellee.

Before STEWART, Chief Judge, and BARKSDALE and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Respondent–Appellee the Commissioner of Internal Revenue issued Petitioner–Appellant Brian Brinkley a notice of deficiency for the 2011 tax year. The Commissioner charged that Brinkley had mischaracterized $1.8 million of the $3.1 million he received as a result of the merger between his company (Zave Networks, Inc.) and Google, Inc., as long-term capital gain rather than ordinary income. The Commissioner therefore found a federal income tax deficiency of $369,071 and assessed an accuracy-related penalty of $48,036.15. Brinkley petitioned the U.S. Tax Court to challenge both the deficiency and the penalty. Following a bench trial, the tax court sustained the Commissioner's determinations in a written order. We affirm the tax court's decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Brinkley was a founding member of Zave Networks, Inc. ("Zave"), a company offering digital coupon services under the name "Zavers." Brinkley began his career with Zave in 2006 as an independent contractor, but in 2010 he became a salaried employee as Zave's Chief Technology Officer. Commencing in 2006, in addition to Brinkley's monetary compensation, Zave issued Brinkley restricted stock grants.

Brinkley initially owned roughly 9.8% of Zave's stock. However, as investors contributed additional capital to the company, Brinkley's equity interest was diluted. Brinkley threatened to leave Zave if his interest fell below 3%, so in 2009, Zave's President Thad Langford agreed to issue Brinkley additional restricted stock grants to maintain his stake.

In 2011, Google, Inc., ("Google") began negotiations to acquire Zave as a wholly owned subsidiary. Brinkley took no part in the negotiations. In September 2011, Google acquired all of Zave's stock pursuant to a merger agreement. At closing, Brinkley held 1,340,000 shares of Zave common stock, 200,000 of which were unvested; Brinkley estimated that his equity interest in Zave at this time was between one and three percent. Although Brinkley was only a minority shareholder of Zave, he maintained that Zave needed his stock and his consent to effectuate the merger because he was one of the "key holders" of Zave's intellectual property (IP) and Google wanted both that IP and a commitment by Brinkley to work for the company.

Before the merger terms were finalized, Brinkley met with Ronald and Lance LeMay, two of Zave's directors, to discuss Brinkley's payout. The LeMays advised Brinkley that Zave would be sold to Google for $93 million and that Brinkley's Zave stock was worth approximately $800,000. Brinkley contested this valuation, asserting that because he owned 3% of Zave, his stock was worth "about $3 million or at least 3 percent of the company." The LeMays then presented Brinkley with a letter ("letter agreement I"), dated July 25, 2011, that purported to "confirm[ ] the agreement between [Brinkley] and Zave ... regarding compensation

payable to [Brinkley] upon a Google Liquidation Event." Letter agreement I stated that the pay was "in consideration of [Brinkley's] employment with [Zave]," and, under the heading "Compensation," it promised Brinkley:

> a lump-sum amount ... equal to (i) 3.1/93rds of the aggregate cash consideration paid by Google, ... in exchange for all the outstanding shares, warrants and options of the Company in connection with the Google Liquidation Event, less (ii) the aggregate amount received by you in connection with the Google Liquidation Event as consideration for all of your shares, warrants and options of the Company.

Brinkley was uncomfortable with the language of letter agreement I—he felt that "it was not an accurate description of what we had agreed upon," and he was displeased with its references to "compensation" and "3.1/93rds" of the total consideration—so he asked his accountant, Mark Richter, to review the document with tax attorneys Leonard Leighton and Luis De Luna. The team reported that letter agreement I "would make it look like [Brinkley] was getting compensation for the sale ...," and that ... [his] objective was ... to sell [his] portion of the company for $3.1 million." Leighton and De Luna therefore commenced negotiations with Zave on Brinkley's behalf to secure an agreement that conformed to Brinkley's expectations. However, Brinkley never apprised Richter, Leighton, or De Luna of the actual number of Zave shares he owned or of their reported valuation of $800,000.

On August 1, 2011, Zave prepared another proposed letter agreement with Brinkley's tax attorneys ("letter agreement I(a)"). Under the heading "Distribution," letter agreement I(a) provided that Brinkley would receive $3,100,000 "in exchange for all of [his] outstanding shares of Zave Networks, Inc., less [his] prorata share of the costs of any bridge loan taken out by the company prior to closing." The document contained no reference to Brinkley's employment with either Zave or Google. Brinkley was unaware of this proposed agreement until pretrial discovery in the tax court.

Finally, on August 27, 2011, Zave delivered a third proposed agreement to Brinkley ("letter agreement II"). Letter agreement II provided that Zave would pay Brinkley:

> an aggregate amount (the "Consideration") equal to ... $3,100,000[ ] of the ... $93,000,000[ ] purchase price offered by Google, as adjusted in the Merger Agreement in exchange for (i) all of your shares, warrants and options of [Zave] and (ii) your execution of a Key Employee Offer Letter and Proprietary Information and Inventions Assignment Agreement with Google as required in the Merger Agreement.

Letter agreement II further advised Brinkley that he "w[ould] not be entitled to the Consideration, except for any amount [he] would be entitled to receive in exchange for [his] shares, warrants and options in the absence of this Agreement, if [he] d[id] not comply with the terms of the Merger Agreement or if the Google Liquidation Event d[id] not occur." In addition, letter agreement II contained a provision titled "Internal Revenue Code Compliance including I.R.C. § 409A," which stated that Brinkley would receive payment "on the same schedule and under the same terms and conditions as apply to payments to [Zave]'s securityholders or stockholders in connection with the Google Liquidation Event." This provision also indicated that "payment will be subject to all adjustments, tax withholdings, if any, and escrow as required in the Merger Agreement" and that "the Consideration is

to be received by you only at the time(s) and to the extent of the definitive agreements to be entered into with Google Inc. in the event of a Google Liquidation Event." Lastly, of relevance to this appeal, letter agreement II contained a merger clause and a forum-selection clause.[1]

Brinkley and Zave executed letter agreement II on August 27, 2011. Although Brinkley only saw an "in-process," redacted version of the merger agreement and did not see any of the schedules to the agreement, two of the schedules listed Brinkley as a deferred-compensation recipient: Schedule 1.6(a) identified letter agreement II as Brinkley's deferred-compensation plan, and Spreadsheet Certificate Pursuant to Section 1.2(c)(xiii) valued Brinkley's deferred compensation at $2,239,844, with $360,065 placed in escrow, resulting in a value at closing of $1,879,779.[2] Unbeknownst to Brinkley, merger-related correspondence between Zave and its payroll company, Synergy, also described Brinkley as a deferred-compensation recipient. However, Brinkley was not asked to sign the consent form that was distributed to Zave employees who held stock options and therefore were entitled to deferred compensation.[3] Nevertheless, Brinkley did execute a

shareholder-consent form affirming that he approved of the merger agreement, he consented to be bound by its terms, and he had the opportunity to review with his tax adviser the tax consequences of the merger.[4] Brinkley also signed the offer letter and the assignment agreement referenced in letter agreement II, under which Brinkley assigned his rights in certain Zave IP to Google and, in turn, became a Google employee with an annual salary of $231,000, an annual discretionary bonus of 25% of his peer-group salary, and a $2.5 million stay bonus.

Following the merger closing in September 2011, Brinkley was entitled to total compensation of $3,027,515, and he received a paycheck from Zave that listed $1,879,779 as "stock compensation pay" subject to federal income tax withholding.[5] Brinkley's W–2 form from Synergy similarly characterized this sum as "stock compensation pay" and included it in Brinkley's taxable income. Recognizing that such tax treatment denoted that Zave had characterized the $1.8 million as ordinary income, rather than as part of the $3 million he believed Zave had agreed to pay for his stock, Brinkley contacted Richter, Leighton, and De Luna to seek corrective action.

---

1. The merger clause states, in relevant part, that "[t]his Agreement covers [Brinkley's] entire agreement with [Zave] and supersedes all prior agreements, written or oral, between [Brinkley] and [Zave] relating to the subject matter of this Agreement." The forum-selection clause declares that "[t]his Agreement and all disputes arising hereunder shall be subject to, governed by and construed in accordance with the laws of the State of Kansas."

2. Notably, the Spreadsheet Certificate also calculated Brinkley's total stock value to be $787,671.

3. This form is titled "Written Consent, Release and Joinder of the Deferred Compensation Recipients."

4. This form is titled "Action by Written Consent of the Stockholders of Zave Networks, Inc." Brinkley did not in fact review the merger agreement with his tax advisers.

5. According to the Spreadsheet Certificate, of the total sum of $3,027,515, $2,239,844 was for deferred compensation-$360,065 of which was held in escrow-and $787,671 was the value of Brinkley's stock. The $1,879,779 in Brinkley's paycheck was the result of $2,239,844 in deferred-compensation pay less $360,065 held in escrow.

On November 14, 2011, De Luna sent a letter to Zave on Brinkley's behalf. De Luna accused Zave of failing to "characterize the transaction as it indicated in its letter agreement ... to Mr. Brinkley dated August 1, 2011," causing Brinkley financial harm in the amount of $591,191. De Luna demanded that, within thirty days, Zave recharacterize the transaction as capital, refund Brinkley $591,191, and issue corrective reports with the IRS. He then warned Zave that its "failure to conform to [this] demand will result in" Brinkley filing suit for breach of contract and challenging Zave's tax treatment of the payment by assuming an adverse position on Brinkley's tax return. Significantly, De Luna's letter referenced only letter agreement I(a), and De Luna testified at trial that he had not seen letter agreements I or II when he drafted the demand letter. Although Brinkley did not receive a response from Zave in regard to his letter, Brinkley did not file suit.

Brinkley enlisted Richter to prepare his 2011 federal income tax return. Although Richter no longer worked with Leighton and De Luna after December 2011, and therefore could have no further discussions with the attorneys regarding Brinkley's taxes, the three men had previously discussed how to report Brinkley's income if Zave did not correct the W–2. On Richter's advice, Brinkley filed a return inconsistent with Zave's W–2 and reported the $1.8 million on Schedule D as part of the proceeds of the sale of his stock. As a result, Brinkley reported wages of $226,073 and net long-term capital gain of $2,261,423.[6] Brinkley also claimed estimated tax payments of $465,782 and withholding credits of $58,560, even though he had made no estimated tax payments for 2011 and the

total sum of income tax actually withheld from him that year was $524,341. In so doing, Brinkley effectively reclassified as estimated tax the amount that he calculated had been wrongly withheld from the $1.8 million reported on his W–2 as stock compensation pay.

Additionally, Brinkley completed a Form 4852 (Substitute for Form W–2), on which he reported wages and withholding that differed from the amounts listed on his Zave W–2—$176,728 in wages and $42,524 of withholding on the Form 4852, as opposed to $2,056,501 in wages and $512,305 of withholding on the W–2—and provided an explanation of the inconsistent reporting. In his explanation, which included a copy of letter agreement II, Brinkley stated that the $1.8 million reported by Synergy as wages was "a stock purchase not compensation," and he emphasized in bolded, capitalized, and italicized font that letter agreement II awarded him $3.1 million *"IN EXCHANGE FOR (I) ALL OF YOUR SHARES, WARRANTS, AND OPTIONS OF THE COMPANY."* Brinkley made no reference to the second clause of the compensation provision in letter agreement II. Instead, he surmised that Zave "has miss classified [*sic*] this transaction in an effort to minimize the profits realized from the liquidation of Zave Networks by treating the purchase of the taxpayer's stock as ordinary compensation as opposed to issuing the entire amount on a 1099b as it should have been." Brinkley concluded by requesting that the excess tax withheld be treated as a 2011 estimated tax payment and that he be refunded his overpaid Medicare taxes.

---

**6.** Brinkley's net capital gain resulted from $2,476,455 attributable to the Zave stock sale (a sale price of $2,540,828 less a cost basis of $64,373), less $1,619 in short-term capital loss and $213,413 in long-term capital loss.

## B. Procedural Background

On January 9, 2013, the Commissioner issued Brinkley a notice of deficiency for 2011, asserting an income tax deficiency of $369,071 and assessing an accuracy-related penalty of $48,036 under I.R.C. § 6662(a). As the ground for the deficiency, the Commissioner found that the $1.8 million that Brinkley received from Zave and characterized as capital gain was in fact ordinary income.

Brinkley petitioned the tax court to challenge the Commissioner's determinations. Following a bench trial at which Brinkley and De Luna were the only witnesses, the tax court upheld the Commissioner's findings. The court first held that although the burden of proof remained on Brinkley under I.R.C. §§ 6201(d) and 7491(a), "[t]he preponderance of the evidence, without regard to burden of proof," supported the Commissioner's position that Brinkley's $3.1 million merger payout represented both "the value of his stock and compensation for service previously rendered or to be rendered in the future." The court next held that the Commissioner discharged his burden of production on the accuracy-related penalty and that Brinkley failed to satisfy the "reasonable cause and good faith" defense in I.R.C. § 6664. Brinkley timely appealed.

## II. JURISDICTION

This Court has jurisdiction pursuant to I.R.C. § 7482(a)(1).

## III. DISCUSSION

Brinkley brings three challenges to the tax court's decision. First, he contends that under I.R.C. §§ 6201(d) and 7491(a), the burden of proof regarding his tax liability should have shifted back to the Commissioner. Second, he claims clear error in the tax court's finding that the $3.1 million he received in the merger represents more than just the proceeds of his stock sale, and in its subsidiary finding that the $1.8 million he claimed in capital gain was in fact ordinary income. Third, he asserts clear error in the tax court's finding that he was not entitled to the "reasonable cause and good faith" defense against an accuracy-related penalty under I.R.C. § 6664.

## A. The Allocation of the Burden of Proof

[1] "The allocation of the burden of proof [under I.R.C. § 7491] is a legal issue reviewed *de novo.*" *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 332 (5th Cir.2010) (quoting *Marathon Fin. Ins., Inc., RRG v. Ford Motor Co.*, 591 F.3d 458, 464 (5th Cir.2009)).

As a general rule, the Commissioner's determination of a tax deficiency is presumed correct, and the taxpayer has the burden of proving the determination to be erroneous. *See* Tax Ct. R. 142(a); *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). However, I.R.C. §§ 6201(d) and 7491(a) set forth exceptions to this rule. Under § 6201(d), "if a taxpayer asserts a reasonable dispute with respect to any item of income ... and the taxpayer has fully cooperated with the Secretary ...; the Secretary shall have the burden of producing reasonable and probative information concerning such deficiency." Similarly, under § 7491(a), if "a taxpayer [ (1) ] introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax,"[7] (2) complies with certain

---

7. Although this Court has yet to speak on what constitutes "credible evidence," the Eighth and Tenth Circuits have defined the term to mean "the quality of evidence, which

substantiation requirements, (3) "maintain[s] all records required under this title," and (4) "cooperate[s] with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews," then "the Secretary shall have the burden of proof with respect to such issue." Nevertheless, this Court has held that the operation of this burden-shifting scheme is irrelevant when both parties have met their burdens of production and the preponderance of the evidence supports one party. *See Whitehouse Hotel,* 615 F.3d at 332; *Knudsen v. Comm'r,* 131 T.C. 185, 189 (2008) ("[A]n allocation of the burden of proof is relevant only when there is equal evidence on both sides.").

Here, the tax court initially found that Brinkley "did not introduce credible evidence regarding the tax character of the income in issue that merited a shifting of th[e] burden [of proof] to [the Commissioner]" under §§ 6201(d) and 7491(a). But the court ultimately declined to hold Brinkley to his burden, concluding instead that "[t]he preponderance of the evidence, without regard to burden of proof, is that [under letter agreement II] petitioner received the value of his stock and compensation for service previously rendered or to be rendered in the future." Accordingly, the resolution of this issue turns on the tax court's finding that the preponderance of the evidence supports the Commissioner's position that the $3.1 million payout in letter agreement II amounted to compensation for both his stock and his services to Zave and/or Google—and therefore was properly characterized as ordinary income.

■ We agree with the tax court's finding that the preponderance of the evidence

favors the Commissioner's deficiency determination, so any error in the court's allocation of the burden of proof is harmless. *See Whitehouse Hotel,* 615 F.3d at 332; *Blodgett v. Comm'r,* 394 F.3d 1030, 1039 (8th Cir.2005).

## B. The Character of the Consideration

### 1. *Standard of Review*

■ This Court applies the same standard of review to tax court decisions and district court decisions: Findings of fact are reviewed for clear error and issues of law are reviewed de novo. *Green v. Comm'r,* 507 F.3d 857, 866 (5th Cir.2007). "Under the clearly erroneous standard, [this Court] will uphold a finding so long as it is plausible in light of the record as a whole, or so long as this [C]ourt has not been left with the definite and firm conviction that a mistake has been made." *Chemtech Royalty Assocs., L.P. v. United States,* 766 F.3d 453, 460 (5th Cir.2014) (citations and internal quotation marks omitted) (quoting *United States v. Ekanem,* 555 F.3d 172, 175 (5th Cir.2009) and *Streber v. Comm'r,* 138 F.3d 216, 219 (5th Cir.1998)). Additionally, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The "characterization of a transaction for tax purposes is a question of law subject to de novo review, but the particular facts from which that characterization is made are reviewed for clear error." *Chemtech,* 766 F.3d at 460 (quoting *Southgate Master Fund, L.L.C. ex rel. Montgomery Capital*

---

after critical analysis, the court would find sufficient upon which to base a decision on the issue *if no contrary evidence were submitted....*" *Blodgett v. Comm'r,* 394 F.3d 1030, 1035 (8th Cir.2005) (quoting *Griffin v.*

*Comm'r,* 315 F.3d 1017, 1021 (8th Cir.2003)); *accord Rendall v. Comm'r,* 535 F.3d 1221, 1225 (10th Cir.2008) (citing *Blodgett,* 394 F.3d at 1035).

*Advisors, LLC v. United States,* 659 F.3d 466, 480 (5th Cir.2011)).

The tax court's conclusion regarding the character of Brinkley's consideration has both factual and legal components-the finding that Brinkley's merger income was the product of more than just the sale of his stock is a factual determination, and the holding that the $1.8 million in contested income qualifies as ordinary income rather than capital gain is a conclusion of law.

### 2. *Governing Law*

■ Gain from the sale of a capital asset, such as stock, may receive the preferential tax treatment of long-term capital gain if certain conditions are satisfied. *See* I.R.C. §§ 1(h), 1221(a), 1222(3). As the Supreme Court has noted, "not every gain growing out of a transaction concerning capital assets is allowed the benefits of the capital gains tax provision"—"[t]hose are limited by definition to gains from 'the sale or exchange' of capital assets." *Dobson v. Comm'r,* 321 U.S. 231, 231–32, 64 S.Ct. 495, 88 L.Ed. 691 (1944). "[W]hether or not a sale or exchange has taken place for income tax purposes must be ascertained from all relevant facts and circumstances," and "the form of an agreement is not of itself determinative of the question of whether payments to the taxpayer should be treated as ordinary income or capital gains." *Estate of Nordquist v. Comm'r,* 481 F.2d 1058, 1061 (8th Cir.1973). Rather, "[a] transaction's tax consequences depend on its substance, not its form." *Chemtech,* 766 F.3d at 460 (quoting *Southgate,* 659 F.3d at 478–79). Ordinary-income treatment is afforded to compensation for services rendered, *e.g., Roscoe v. Commissioner,* 215 F.2d 478, 480–81 (5th Cir.1954), and to consideration for the execution of a contract such as a covenant not to compete, *e.g., Sonnleitner v. Commissioner,* 598 F.2d 464, 466 (5th Cir.1979).

■ When there is evidence that part of the consideration for a sale of stock amounts to compensation for ordinary-income-producing activities, the portion of the consideration exceeding that attributable to the exchange of the capital assets themselves may be taxable as ordinary income rather than capital gain. *See Roscoe,* 215 F.2d at 480–81. In *Roscoe,* real-estate partners Roscoe and Carr joined with two private investors, Goodfriend and Shellenberger, to purchase a tract of land for development. *Id.* at 479. The four formed a corporation and issued themselves a total of 120 shares of stock—20 shares each to Roscoe and Carr and 40 shares each to Goodfriend and Shellenberger. *Id.* The corporation then executed an agreement with Roscoe and Carr's real-estate partnership, under which the corporation agreed to subdivide the tract and the partnership agreed to "manage and supervise" the subdivision process and to sell the lots for a 10% commission. *Id.* Two other individuals interested in buying the entire tract negotiated an agreement whereby they would purchase all 120 shares of stock for $121,179, "in consideration of which [they would] assume[ ] the outstanding obligations of the corporation" and Roscoe and Carr would cancel the commission provision in their partnership's agreement with the corporation. *Id.* Under the agreement, Roscoe and Carr received a total of $57,289 for their combined 40 shares—$25,345 more than the $31,944 Goodfriend and Shellenberger each received for their 40 shares. *Id.* at 479–80.

Following the issuance of a notice of deficiency, the tax court found that $31,944 of this $57,289 sum represented payment for Roscoe and Carr's 40 shares of stock, "and the excess of $25,345.40, or the remaining amount over and above the sum

received by the other two stockholders for the same number of shares, actually represented additional compensation for services, which was taxable as ordinary income rather than as capital gain." *Id.* Roscoe and Carr argued on appeal that "their proportionate share of the amount received for their stock in the corporation" was taxable as long-term capital gain rather than ordinary income, as "the entire $57,289.96 was solely in consideration for the sale of their stock." *Id.* at 480. This Court affirmed the tax court's decision. *Id.* at 482. It opened with the observation that:

> while it is generally recognized that the motive to avoid taxes cannot condemn a transaction otherwise legal, it is also true that the Tax Court, in order to prevent diminution of revenue legitimately due, is not bound to accept taxpayers' version of a transaction as having the binding effect vis-a-vis taxation intended by the parties, particularly where, as here, other testimony and inferences lend support to its conclusion that it represented an agreed method of indirectly compensating parties for services rendered.

*Id.* at 481 (footnote omitted).

The Court took note of Goodfriend's testimony that Roscoe and Carr received the excess sum "for the work they had done in supervising the subdivision." *Id.* In addition, the Court found that despite Roscoe's "bare assertion" that his and Carr's stock was worth more than Goodfriend and Shellenberger's stock because of their commission contract and their power to impede the sale by withholding consent, "there was no convincing testimony that taxpayers' combined 40 shares of stock were any more valuable than the identical number of shares sold in the same transaction by Goodfriend and Shellenberger, so as to lend support to the contention that the

consideration paid was solely in exchange for the stock." *Id.*

### 3. *Analysis*

■ Here, the tax court held that the preponderance of the evidence supported the Commissioner's finding that Brinkley's $3.1 million merger payout could not be ascribed exclusively to the sale of Brinkley's interest in Zave and that the $1.8 million difference between Brinkley's claimed capital gain and the actual value of his stock was taxable as ordinary income.

Brinkley contends that the tax court's finding was clearly erroneous. Brinkley argues he negotiated a price for the sale of his stock well above its value as calculated by Zave—$3.1 million versus $787,671 for the same block of 1,340,000 shares—and that the correspondence culminating in letter agreement II reflected the parties' mutual assent to this arrangement. Brinkley cites his agreement with Zave, under which he was assured that his equity interest would not dip below 3% of the company, and his negotiating power as a key employee and the holder of certain IP, as proof that Zave had an incentive to pay him far more than the value of his shares in order to secure his consent to the merger. He also points to the text of the various letter agreements as evidence that he and Zave arrived at the sum of $3.1 million without reference to past or future services, and he contends that none of this amount could be for deferred compensation because he has never held any deferred-compensation plan. Further, Brinkley asserts the compensation could not be for future services because the separate employment agreement he signed with Google already generously compensated him for his future services by providing him an annual salary of $231,000, an annual discretionary bonus of 25% of his

peer-group salary, and a $2.5 million stay bonus.

Brinkley's arguments are unpersuasive for several reasons. First and foremost, the plain text of letter agreement II supports the Commissioner's position. It sets forth two conditions on Brinkley's receipt of the merger consideration: (1) the exchange of Brinkley's Zave shares and (2) the execution of a Key Employee Offer Letter and Proprietary Information and Inventions Assignment Agreement with Google. Brinkley argues that the entire $3.1 million in consideration must have been for the first condition alone, as this amount had been set in letter agreements I and I(a)—which contained no reference to the second condition—and he was set to receive generous compensation from Google for his future employment. But letter agreement I is ambiguous in its intent—it provided compensation for Brinkley's stock, but also stated in its introduction that the agreement was "in consideration of [Brinkley's] employment with [Zave]." Further, while letter agreement I(a) does seem to provide consideration exclusively for Brinkley's stock and does not mention past or future services to be performed, this letter was never actually presented to Brinkley. Most significantly, neither letter agreement I nor I(a) were ultimately executed by the parties and are thus of limited relevance. Both parties ultimately executed letter agreement II, which unambiguously lists both conditions and includes a merger clause that supersedes all prior agreements.

As for Brinkley's argument concerning his future compensation as a Google employee, it is not inconsistent with letter agreement II for Zave to assign value to Brinkley's willingness to execute the employment and assignment agreements, separate and apart from Google's valuation of Brinkley's future services. Brinkley seems to implicitly concede as much when he avers that, despite his minority share, he wielded considerable bargaining power as Chief Technology Officer. And, contrary to Brinkley's contention that the tax court erroneously failed to ascribe any specific value to the assignment of his IP rights to Google, letter agreement II frames the second condition in terms of the execution of a separate IP-assignment agreement, not the assignment of IP rights themselves, and neither letter agreement II nor Brinkley's trial testimony identified any specific IP contemplated by the parties. At root, Brinkley's position seems to hinge on the premise that once the parties fixed the sum of $3.1 million for his 3% stake in the company, they could not later adjust the portions of that sum allocable to stock, past or future compensation, and commitments to execute work-related agreements. But this is precisely what letter agreement II does.

Further, Brinkley signed the shareholder-consent form, which affirmed that he had read the merger agreement and bound him to accept its terms. The schedules to the merger agreement identified Brinkley as a recipient of deferred compensation and characterized letter agreement II as a deferred-compensation plan. Brinkley responds that letter agreement II does not appear to be a deferred-compensation plan, and he points out that he was not asked to sign the consent form required of other deferred-compensation recipients. This may be true, but it misses the mark. Even if Brinkley's payout was not part of a formal deferred-compensation plan, this does not mean that the payout could not be properly characterized as deferred compensation. The primary definition of the term "deferred compensation" actually just describes a method of payment: "Payment for work performed, to be paid in the future or when some future event occurs." Black's Law Dictionary 343 (10th

ed.2014).[8] Brinkley's signing of the employment and assignment agreements, per the requirement of letter agreement II, was the service he performed that entitled him to the additional $1.8 million payment that Zave would later distribute to him. In addition, letter agreement II includes a paragraph titled "Internal Revenue Code Compliance including I.R.C. § 409A"—referring to a statute that addresses deferred-compensation plans—and within this paragraph states that payment will be "subject to all adjustments, tax withholdings, if any, and escrow as required in the Merger Agreement" and would be paid out "only at the time(s) and to the extent of the definitive [merger] agreements" with Google. Zave's treatment of this payment as deferred compensation subject to ordinary-income tax withholding is consistent with the definition of deferred compensation and with the terms of letter agreement II.

Finally, the facts in this case are broadly similar to *Roscoe*. *See* 215 F.2d at 479–81. As in *Roscoe*, there is substantial evidence that the consideration paid to Brinkley, although nominally for the exchange of his stock, was partly compensation for services rendered. Although the taxpayers in *Roscoe* were compensated for past services rendered, and Brinkley was more likely compensated for future service to be rendered—namely, his execution of the employment and assignment agreements—Brinkley's future service was an ordinary-income producing activity and was not entitled to long-term capital gains treatment, *see, e.g., Sonnleitner*, 598 F.2d at 466. Also similar to the taxpayers in *Roscoe*, Brinkley argues that his stock was more valuable than other shares because he was a critical employee and because Zave viewed his consent as necessary to the merger. Nevertheless, Brinkley fails to offer "convincing testimony" that his shares were in fact more valuable than other shares and that Zave was not simply compensating him for future services as the plain language of letter agreement II indicates. Following *Roscoe*, therefore, we find no clear error in the tax court's conclusion that the outstanding $1.8 million in compensation qualifies as ordinary income rather than capital gain.

## C. The Accuracy–Related Penalty

■ The determination of whether a taxpayer has satisfied the "reasonable cause and good faith" defense to an accuracy-related penalty under I.R.C. § 6664 is a finding of fact reviewed for clear error. *Green*, 507 F.3d at 871.

■ I.R.C. § 6662 mandates a 20% penalty for any underpayment of tax attributable to a "substantial understatement of income tax." I.R.C. § 6662(a), (b)(2). An understatement is substantial if it "exceeds the greater of . . . 10 percent of the tax required to be shown on the return for the taxable year, or . . . $5,000." *Id.* § 6662(d)(1)(A).[9] However, this penalty does not apply to any portion of an underpayment if the taxpayer shows "that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." *Id.* § 6664(c)(1). The taxpayer bears the burden of proof on this defense, *Klamath Strategic Investment Fund v. United*

---

8. The secondary definition makes reference to formalized compensation plans, but it still primarily describes a method of payment and taxation: "An employee's earnings that are taxed when received or distributed rather than when earned, such as contributions to a qualified pension or profit-sharing plan." Black's Law Dictionary 343 (10th ed.2014).

9. There is no dispute that Brinkley's understatement of tax is substantial within the meaning of I.R.C. § 6662(d)(1)(A).

*States,* 568 F.3d 537, 548 (5th Cir.2009), and the determination of whether the taxpayer has successfully discharged this burden "is made on a case-by-case basis, taking into account all pertinent facts and circumstances," Treas. Reg. § 1.6664–4(b)(1). "The most important factor is the extent of the taxpayer's effort to assess his proper liability in light of all the circumstances." *Klamath,* 568 F.3d at 548.

■ Further, "[r]eliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith; rather, the validity of this reliance turns on 'the quality and objectivity of the professional advice which they obtained.'" *Id.* (quoting *Swayze v. United States,* 785 F.2d 715, 719 (9th Cir.1986)). Not only must the taxpayer's reliance be "reasonable and made in good faith," but the advice itself "must be based upon all pertinent facts and circumstances" and "must [neither] be based on unreasonable factual or legal assumptions ... [nor] unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." Treas. Reg. § 1.6664–4(c)(1).

■ The tax court held that Brinkley had failed to prove that he was entitled to the defense. It concluded that Brinkley did not make a good faith effort to assess his tax liability because he "chose to keep from his advisers essential facts, such as the amount of stock he owned and the stock's determined value in comparison to the amount he was receiving, and essential documents, such as the executed consent of the shareholders and the initial merger agreement." These circumstances also rendered unreasonable Brinkley's reliance on his tax advisers. The court additionally found that Brinkley did not carry his burden of showing he could reasonably rely on Richter's advice, as Richter did not testify, depriving the court of evidence of his com-

petence and expertise. The court found that Richter appeared to rely "solely on [Brinkley's] representations." Lastly, the court noted that Brinkley's misrepresentations on his tax return are inconsistent with a "good-faith effort to reach the proper tax liability."

Brinkley contends that he made a clear effort to determine his tax liability, as evidenced by his consultations with Richter, Leighton, and De Luna. He disputes the tax court's finding that he failed to share relevant information with his advisers, suggesting that he had no reason to review the merger agreement or to suspect that he would be treated as a deferred-compensation recipient, and asserting that although he did not discuss the quantity and value of his stock holdings with De Luna, this does not mean that he had no such discussions with Leighton and Richter. He also cites Richter's master's degree in accounting and Richter's consultations with Leighton and De Luna before leaving their office as evidence that Richter was competent to complete his return.

We find no clear error in the tax court's holding. There is no genuine dispute that Brinkley failed to consult with his advisers before signing the Action by Written Consent form, neglected to share letter agreement II with De Luna (the author of the demand letter to Zave and the sole member of Brinkley's team of advisers who testified at trial), and omitted reference to the quantity and determined value of his shareholdings in discussions with De Luna. In addition, although some testimony at trial indicated that Richter had a master's degree in accounting, Richter did not testify and so could not speak to his qualifications and the information in his possession when he advised Brinkley. Moreover, Richter was no longer in contact with Leighton and De Luna at the time he filed Brinkley's return, so while he may have

conferred with the attorneys previously, there is no evidence concerning his work after his departure. These facts lend credence to the tax court's conclusion that Brinkley did not make a good faith effort to assess his tax liability and could not reasonably rely on his advisers. *See Green,* 507 F.3d at 872 (affirming the denial of the defense where, *inter alia,* "there was no evidence as to what Green told the preparer, what the preparer told Green, and whether or not Green's reliance on any advice from the preparer was reasonable").

Accordingly, the tax court's conclusion that Brinkley did not carry his burden to prove reasonable cause and good faith is "plausible in light of the record as a whole" and does not produce "the definite and firm conviction that a mistake has been made," *Chemtech,* 766 F.3d at 460.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the tax court's decision.