# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
October 4, 2021

Lyle W. Cayce
Clerk

No. 20-30723

WILLIAM GOLDRING; JANE GOLDRING,

*Plaintiffs—Appellants*,

*versus*

UNITED STATES OF AMERICA,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-10756

Before JONES, SOUTHWICK, and ENGELHARDT, *Circuit Judges*.
KURT D. ENGELHARDT, *Circuit Judge*:

In this tax refund action arising under the Internal Revenue Code ("IRC"), the district court granted summary judgment in favor of the Government and dismissed William and Jane Goldring's claims in their entirety. For the following reasons, we AFFIRM IN PART and REVERSE IN PART.

## I.

In 1997, Jane Goldring ("Mrs. Goldring") held 120,000 shares of stock—roughly a 15% stake—in Sunbelt Beverage Corporation ("Sunbelt"),

No. 20-30723

a privately held Delaware corporation. On August 22, 1997, Sunbelt engaged in a cash-out merger, which resulted in Mrs. Goldring's Sunbelt shares being cancelled as of the merger date and converted into the right to receive $45.83 per share.

On December 12, 1997, Mrs. Goldring filed a petition for appraisal of her Sunbelt shares in the Delaware Court of Chancery ("Delaware Court").[1] On August 12, 1999, Mrs. Goldring filed a separate complaint in the Delaware Court asserting claims for unfair dealing and breach of fiduciary duty against Sunbelt and its corporate directors. In December 2001, the two actions were consolidated ("Delaware Litigation"). Mrs. Goldring requested rescissory relief in the form of restoration of her 15% stake in Sunbelt. In the alternative, she requested the fair value of her Sunbelt shares as of the merger date, interest on the fair value of her shares, court costs, attorneys' fees, and expert fees.

The Delaware Litigation was stayed for several years, pending the conclusion of arbitration proceedings. After the stay was lifted, a three-day bench trial was held in April 2009. The Delaware Court issued a written opinion on February 15, 2010, which found that Sunbelt and its directors undervalued Mrs. Goldring's Sunbelt shares and failed to act with "any semblance of fair process" during the merger. Applying the "discounted cash flow" valuation methodology recommended by the parties' respective experts, the Delaware Court found that the fair value of Mrs. Goldring's Sunbelt shares on the merger date was $114.04 per share. The Delaware

---

[1] *See* 8 DEL. C. § 262(a). ("Any stockholder of a corporation of [Delaware] who holds shares of stock on the date of the making of a demand . . . with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation . . . and who has neither voted in favor of the merger or consolidation nor consented thereto in writing . . . shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock . . . .").

No. 20-30723

Court declined to award Mrs. Goldring her requested rescissory relief, based on practical difficulties in carving out a 15% stake of Sunbelt's complex business portfolio and the court's conclusion that the fair value award of $114.04 per share was an adequate substitute remedy. The Delaware Court awarded Mrs. Goldring court costs and expert fees but declined to award attorneys' fees. Finally, the Delaware Court exercised its statutory discretion to award Mrs. Goldring pre- and post-judgment interest for the period between the merger date and payment of the judgment, calculated at the rate established under Delaware law.[2] The Delaware Court directed the parties to agree on a proposed order implementing the terms of its decision.

On March 12, 2010, the parties executed a Forbearance and Payment Agreement ("Forbearance Agreement"), whereby Sunbelt agreed to pay the following amounts to Mrs. Goldring by April 15, 2010:

- $13,684,800 ($114.04 x 120,000 shares), the fair value of Mrs. Goldring's Sunbelt shares on the merger date;

- $26,067,243.83 in pre-judgment interest at the Delaware statutory rate from the August 12, 1999 merger date through March 7, 2010;

- $9,820.28 in court costs;

- $841,763 in expert fees; and

- Post-judgment interest at the Delaware statutory rate from March 8, 2010 through the date the judgment was paid.

---

[2] *See* 8 DEL. C. § 262(h) ("Unless the Court in its discretion determines otherwise for good cause shown, and except as provided in this subsection, interest from the effective date of the merger through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate . . . as established from time to time during the period between the effective date of the merger and the date of payment of the judgment.").

No. 20-30723

In exchange, Mrs. Goldring agreed to surrender her stock certificates to Sunbelt and waive her right to appeal the Delaware Court's decision.

On April 5, 2010, Sunbelt paid Mrs. Goldring the amounts listed in the Forbearance Agreement, plus $185,497.39 in post-judgment interest—a total of $40,789,124.50 ("Delaware Litigation Award"); Mrs. Goldring, in turn, surrendered her stock certificates to Sunbelt. A Judgment and Satisfaction of Judgment was entered in the Delaware Court on April 6, 2010.

On their joint federal income tax return for 2010, Mrs. Goldring and her husband, William Goldring (collectively "the Goldrings"), reported the entire Delaware Litigation Award as income from the disposition of a capital asset—*i.e.*, Mrs. Goldring's Sunbelt shares—taxable at the long-term capital gain rate. Although the Goldrings believed their reporting position was correct, they recognized that the Internal Revenue Service ("IRS") might subsequently determine that the pre- and post-judgment interest portion of the Delaware Litigation Award ("Interest Award") was ordinary income taxable at the higher ordinary income rate, which would render the Goldrings deficient on their 2010 taxes. In an attempt to avoid assessment of underpayment interest in the event of a later-determined deficiency, the Goldrings paid their 2010 taxes *as if* they had reported the Interest Award as ordinary income. In other words, the Goldrings overpaid their reported 2010 tax liabilities by an amount sufficient to cover any later-determined deficiency for the 2010 tax year.

The Goldrings elected on their 2010 tax return to credit the overpayment forward to their estimated 2011 tax liabilities—an action known as a "credit-elect overpayment"[3] The Goldrings continued to make credit-

---

[3] A taxpayer that reports an overpayment of income tax may request a refund or elect to have the reported overpayment applied to his or her estimated tax for the following year. 26 U.S.C. § 6402(a)–(b); 26 C.F.R. § 301.6402-3(a)(5). "The subject of such an

No. 20-30723

elect overpayments on their tax returns through the 2016 tax year and consistently maintained overpayment balances with the IRS sufficient to cover any potential deficiency for the 2010 tax year during this period.

On July 14, 2015, the IRS completed an audit of the Goldrings' 2010 tax return and determined that the Interest Award should have been reported as ordinary income taxable at the ordinary income rate. Based on this determination, the IRS concluded that the Goldrings had underpaid their 2010 taxes by $5,250,549 and issued the couple a deficiency notice on March 30, 2017. The Goldrings consented to immediate assessment of the deficiency, reserving their right to file a refund claim after the deficiency was paid.

On August 18, 2017, the IRS assessed the following amounts against the Goldrings for the 2010 tax year: (1) the principal deficiency of $5,250,549 ("2010 Deficiency"); and (2) underpayment interest of $603,335.27. In the following manner, the IRS retroactively satisfied the 2010 Deficiency through application of the Goldrings' existing credit-elect overpayment balances and retroactively assessed underpayment interest:

- April 15, 2011 through April 15, 2012: the IRS determined that the Goldrings' credit-elect overpayment for the 2010 tax year offset the 2010 Deficiency and suspended the running of underpayment interest during this period. However, the 2010 credit-elect overpayment was deemed by the IRS to be applied in payment of the Goldrings' 2011 tax liabilities on April 15, 2012 and was no longer available for offset against the 2010 Deficiency moving forward. Therefore, the IRS determined that underpayment interest would run on the 2010 Deficiency from April 16, 2012 until the deficiency was deemed satisfied.

---

election is known as a 'credit elect overpayment' or simply a 'credit elect.'" *FleetBoston Fin. Corp. v. United States*, 483 F.3d 1345, 1347 (Fed. Cir. 2007).

No. 20-30723

- April 16, 2012 through April 15, 2015: the IRS assessed $494,110 in underpayment interest against the Goldrings for this period.

- April 15, 2015: The IRS applied $4,246,848 in overpayment funds from the 2014 tax year to the 2010 Deficiency. The remaining balance on the 2010 Deficiency totaled $1,497,811.

- April 16, 2015 through April 15, 2017: the IRS assessed $109,225 in underpayment interest against the Goldrings for this period.

- April 15, 2017: the remaining balance on the 2010 Deficiency was deemed satisfied by the IRS through its application of overpayment funds from the 2016 tax year.

The Goldrings filed a refund claim with the IRS in September 2017 with respect to the principal 2010 Deficiency and underpayment interest amounts ("Administrative Refund Claim"). When no action had been taken on the Administrative Refund Claim after six months, the Goldrings filed this refund lawsuit in federal district court. *See* 26 U.S.C. § 6532(a)(1).

The Goldrings' complaint sought the following relief: (1) a refund of the amounts requested in their Administrative Refund Claim, plus interest and costs; (2) a declaration that the full Delaware Litigation Award—including the Interest Award—is properly classified and taxed as a capital gain; (3) a declaration that the Goldrings are not liable for underpayment interest; and (4) court costs. The district court disposed of the Goldrings' claims in two orders following the parties' two successive rounds of cross-motions for summary judgment.

In the first round of cross-motions, the district court considered whether the Interest Award should be classified and taxed as a capital gain, as argued by the Goldrings, or classified and taxed as ordinary income, as

6

argued by the Government.[4] The district court granted the Government's motion and denied the Goldrings' motion, finding that the Interest Award was properly classified and taxed as ordinary income. Specifically, the district court found that the Interest Award served to compensate Mrs. Goldring for her inability to use the fair value of her Sunbelt shares from the merger date through the conclusion of the Delaware Litigation, did not reflect a gain to Mrs. Goldring from the sale of her shares, and was not tied to the value of her shares.

In the second round of cross-motions, the district court considered whether the IRS properly assessed underpayment interest on the 2010 Deficiency from April 16, 2012 through April 15, 2017. The Goldrings argued that underpayment interest should not have accrued, because the IRS consistently possessed sufficient credit-elect overpayment funds from the Goldrings to cover the 2010 Deficiency during this period. The Government countered that underpayment interest was properly assessed, because the Goldrings opted to apply their initial 2010 credit-elect overpayment toward their estimated 2011 tax liabilities; those funds were deemed applied on April 15, 2012; and, as a result, those funds were no longer available to suspend the running of underpayment interest on the 2010 Deficiency from April 16, 2012 until the 2010 Deficiency was deemed satisfied on April 15, 2017. Agreeing with the Government's argument, the district court granted the Government's motion and denied the Goldrings' motion.

---

[4] The district court noted that there was no dispute that the Goldrings properly reported the non-interest components of the Delaware Litigation Award—$14,536,383.28 in court costs, expert fees, and the fair value of Mrs. Goldring's Sunbelt shares on the merger date—as capital gains on their 2010 tax return. Likewise, the parties do not dispute the Goldrings' tax treatment of these non-interest amounts on appeal.

The district court issued a final judgment dismissing the Goldrings' claims with prejudice. This appeal followed.

## II.

We review a grant of a motion for summary judgment de novo, and we apply the same standard as the district court, viewing the evidence in the light most favorable to the nonmovant. *First Am. Title Ins. Co. v. Continental Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Courts do not disfavor summary judgment, but, rather, look upon it as an important process through which parties can obtain a "just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A party asserting that there is no genuine dispute as to any material fact must support its assertion by citing to particular parts of materials in the record. FED. R. CIV. P. 56(c)(1)(A).

## III.

### A. Tax Treatment of Interest Award from Delaware Litigation

The IRC affords different tax treatment to ordinary income and capital gains. Income representing gain from the sale or exchange of a capital asset held by a taxpayer for more than one year is considered a long-term capital gain and is taxed at a favorable rate. 26 U.S.C. §§ 1(h), 1222(3). "[N]ot every gain growing out of a transaction concerning capital assets is allowed the benefits of the capital gains tax provision"—"[t]hose are limited by definition to gains from the sale or exchange of capital assets." *Dobson v. Comm'r*, 321 U.S. 231, 231–32 (1944) (citation omitted). "Whether or not a sale or exchange has taken place for income tax purposes must be ascertained from all relevant facts and circumstances and the form of an agreement is not of itself determinative of the question of whether payments to the taxpayer

should be treated as ordinary income or capital gains." *Brinkley v. Comm'r*, 808 F.3d 657, 665 (5th Cir. 2015) (citation omitted). "[A] transaction's tax consequences depend on its substance, not its form." *Southgate Master Fund, L.L.C. ex rel. Montgomery Cap. Advisors, LLC v. United States*, 659 F.3d 466, 478–79 (5th Cir. 2011).

Gross or "[o]rdinary income is taxed at a higher rate." *Rodriguez v. Comm'r*, 722 F.3d 306, 309 (5th Cir. 2013). The IRC broadly defines "gross income" as "all income from whatever source derived." 26 U.S.C. § 61(a). "Interest" is included within the definition of "gross income." *Id.* § 61(a)(4).

The mere fact that litigation proceeds awarded in a final judgment are labeled "interest" does not automatically make those proceeds ordinary income. *See Kieselbach v. Comm'r of Internal Revenue*, 317 U.S. 399, 403 (1943) (noting that "interest" label was "immaterial" to determining tax character of pre- and post-judgment interest award in an eminent domain action). Rather, litigation proceeds are ordinary income when they serve to indemnify taxpayers for "what they might have earned on the sum found to be the value of the property on the day the property was taken" if that sum had been "put in the taxpayers' hands" on that day. *Id.* at 403–04; *see also Isaac G. Johnson & Co. v. United States*, 149 F.2d 851, 852 (2d Cir. 1945); *Wheeler v. Comm'r of Internal Revenue*, 58 T.C. 459, 461 (1972); *Drayton v. United States*, 801 F.2d 117, 124–30 (3d Cir. 1986); *Leonard v. Comm'r*, 94 F.3d 523, 525–26 (9th Cir. 1996), *as amended* (Sept. 5, 1996).

The parties do not dispute that the portion of the Delaware Litigation Award comprising the fair value of Mrs. Goldring's Sunbelt shares is properly classified and taxed as a capital gain. The Goldrings argue that the Interest Award should also be classified and taxed as a capital gain, because it was tied to the fair value of her Sunbelt shares.

No. 20-30723

We disagree. The Delaware Litigation record illustrates that the Interest Award was distinct from the fair value award. The Delaware Court determined that Mrs. Goldring's shares were worth $114.04 apiece by applying the "discounted cash flow" valuation methodology recommended by Mrs. Goldring's and Sunbelt's experts. The pre- and post-judgment interest comprising the Interest Award, on the other hand, was calculated separately through the Delaware Court's application of the statutory interest rate under 8 DEL. C. § 262(h). The Delaware Court's analysis and valuation of Mrs. Goldring's shares made no mention of pre- or post-judgment interest, and the parties' Forbearance Agreement itemized the fair value award and Interest Award separately. In addition, the Delaware Court had statutory discretion both to award pre- or post-judgment interest and to select the rate at which interest was computed. 8 DEL. C. § 262(h); *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 149 (Del. 1980). Considering that the Delaware Court could have declined to award any pre- or post-judgment interest to Mrs. Goldring, it follows that the court's decision to award interest was independent from its decision to value Mrs. Goldring's shares at $114.04 apiece.

Moreover, the Delaware Litigation record demonstrates that the Interest Award was properly classified and taxable as ordinary income under *Kieselbach*. If Sunbelt had simply offered Mrs. Goldring a fair price to cash-out her 120,000 shares on the August 22, 1997 merger date, she could have immediately reaped the benefits of this transaction by investing the proceeds. Instead, she was offered a significantly undervalued price and had to wait for the culmination of nearly 13 years of state court litigation before finally receiving the fair value of her shares. The Delaware Supreme Court has explained that the purpose of a statutory interest award under 8 DEL. C. § 262(h) is to fairly compensate the stockholder for her inability to use the fair value of her shares during a certain time period. *Bell*, 413 A.2d at 149. The

Delaware Court applied 8 DEL. C. § 262(h) to award Mrs. Goldring pre- and post-judgment interest that covered the period between the merger date and the date Sunbelt paid the final judgment in full—the time period Mrs. Goldring was deprived of the fair value of her shares. The Interest Award thus served to indemnify Mrs. Goldring for "what [she] might have earned" on the fair value of her shares if that money had been "put in [her] hands" on the merger date. *Kieselbach*, 317 U.S. at 403–04.

The Goldrings argue that *Kieselbach* is distinguishable from this case, because Mrs. Goldring did not relinquish title to her Sunbelt shares on the merger date but rather did so on the date the Delaware Litigation Award was paid, unlike *Kieselbach*, where a government entity received title to the taxpayers' property immediately upon the taking of that property by eminent domain. The Goldrings further argue that *Kieselbach* involved a government payor unable to deduct interest expenses on tax documents, whereas Sunbelt was a private entity that could advantageously deduct the Interest Award on its taxes. These distinctions are irrelevant. As stated above, *Kieselbach* held that interest awarded in a judgment is ordinary income when it serves to indemnify a taxpayer for her lost opportunity to earn on the fair value of her capital asset. *Id.* The Interest Award in this case served that same purpose.

The Goldrings also argue that the "origin-of-the-claim" doctrine should determine the tax treatment of the Interest Award. *See Woodward v. Comm'r*, 397 U.S. 572, 577 (1970) (test for tax character of litigation expenses is "whether the origin of the claim litigates is in the process of acquisition itself"); *see also Meade's Estate v. Comm'r*, 489 F.2d 161, 166 (5th Cir. 1974) (determination of "whether legal expenses are incurred in the process of disposition of property" depends on "the origin of the particular litigation involved"). The origin-of-the-claim doctrine directs courts to determine the tax treatment of judgments by asking the following question: "in lieu of what was the judgment or litigation settlement awarded?" *Srivastava v. Comm'r*,

220 F.3d 353, 365 (5th Cir. 2000) (citation omitted), *overruled on other grounds by Comm'r v. Banks*, 543 U.S. 426 (2005)). Under this doctrine, the Goldrings contend that the Interest Award was taxable as a capital gain because it was part of a total judgment intended to compensate Mrs. Goldring for the loss of a capital asset—her Sunbelt shares—and it was paid "in lieu of" her claim for restoration those shares.

We disagree. As discussed above, the Interest Award portion of the judgment was awarded "in lieu of" what Mrs. Goldring might have earned on the fair value of her shares for the 13-year period between the merger and final judgment in the Delaware Litigation; thus, it qualifies as ordinary income under the origin-of-the-claim doctrine. *See id*.

For these reasons, the Interest Award is properly classified and taxable as ordinary income.

## B. Assessment of Underpayment Interest

Citing the "use-of-money" principle, the Goldrings contend that the IRS improperly assessed underpayment interest from April 16, 2012 through April 15, 2017, because the IRS had continuous possession of the couple's credit-elect overpayment funds sufficient to satisfy the 2010 Deficiency during this period.

If an amount of tax is not "paid" by the prescribed due date, the IRS may generally assess underpayment interest from that due date through the date the deficiency is satisfied. 26 U.S.C. § 6601(a). Under the use-of-money principle, a taxpayer is liable for interest only when the Government does not have the use of money it is lawfully due. *Manning v. Seeley Tube & Box Co.*, 338 U.S. 561, 566 (1950). We previously endorsed the use-of-money principle in a case involving § 6601(a) underpayment interest. *Vick v. Phinney*, 414 F.2d 444, 448 (5th Cir. 1969) (stating that "interest is assessed in order to

No. 20-30723

compensate a creditor, here the government, for the period during which it was deprived of the use of the money").

We have not considered the application of the use-of-money principle to a scenario where, as here, the IRS assessed underpayment interest on a tax deficiency, even though it possessed credit-elect overpayments funds sufficient to satisfy that deficiency throughout the interest assessment period. Several courts outside of our circuit have encountered this issue, beginning with the Second Circuit in *Avon Prod., Inc. v. United States*, 588 F.2d 342 (2d Cir. 1978). Noting the "clearly established principle that interest is not a penalty but is intended only to compensate the Government for delay in payment of a tax" the *Avon* court interpreted § 6601(a) to provide that "interest shall begin running when a tax becomes both due and *unpaid*." *Id.* at 343–44 (emphasis added). Applying the use-of-money principle, the *Avon* court found that a tax is not considered "unpaid" and § 6601(a) underpayment interest may not run during any period the IRS possesses enough credit-elect overpayment funds to satisfy a later-determined tax deficiency.[5] *Id.* at 343–46. Following *Avon*, district courts have consistently applied the use-of-money principle to reach similar holdings. *May Dep't Stores Co. & Subsidiaries v. United States*, 36 Fed. Cl. 680 (1996); *Sequa Corp. v. United States*, No. 95 CIV. 2086 (KMW), 1999 WL 628286 (S.D.N.Y. June 8, 1999); *In re Vendell Healthcare, Inc.*, 222 B.R. 564 (Bankr. M.D. Tenn. 1998); *Otis Spunkmeyer, Inc. v. United States*, No. C 02-05773 MJJ, 2004 WL 5542870 (N.D. Cal. Aug. 10, 2004).

---

[5] Although the court did not explicitly use the phrase "use of money," the decision implicitly articulated the concept by finding that underpayment interest began to run on the date the IRS no longer had use of sufficient overpayment funds to satisfy the tax deficiency. *Avon*, 588 F.2d at 343–46.

No. 20-30723

The Government does not dispute that the IRS had continuous use of sufficient credit-elect overpayment funds to satisfy the Goldrings' 2010 Deficiency from April 16, 2012 through April 15, 2017. However, the Government argues that 26 U.S.C. §§ 6402(a)–(b) and 6513(d), and their corresponding Treasury Regulations, 26 C.F.R. §§ 301.6402-3(a)(5) and 301.6513-1(d), permitted the IRS to assess underpayment interest during this five-year period.

Section 6402(a)–(b) authorizes the IRS to either credit an overpayment to the taxpayer's estimated taxes for the following year or refund the overpayment to the taxpayer. 26 U.S.C. § 6402(a)–(b). If the taxpayer opts to credit-elect an overpayment forward, then the IRS must apply those funds to the taxpayer's estimated taxes for the following year; however, no overpayment interest is permitted to accrue on the credit-elect overpayment. 26 C.F.R. § 301.6402-3(a)(5). Section 6513(d) provides that a credit-elect overpayment is treated as a payment of the taxpayer's estimated taxes for the following year and that no credit or refund of that overpayment is permitted for the year in which the overpayment arises. 26 U.S.C. § 6513(d). Finally, the corresponding Treasury Regulation to Section 6513 explains how to determine the period of limitations applicable to a credit-elect overpayment. 26 C.F.R. § 301.6513-1(d).

The above-referenced provisions cited by the Government *do not* address the IRS's ability to assess underpayment interest on a later-determined deficiency during periods where the IRS possesses credit-elect overpayment funds from the taxpayer sufficient to satisfy that deficiency. In fact, the provisions relied upon by the Government make no reference whatsoever to underpayment interest or § 6601(a)—the statute that empowers the IRS to charge such interest.

The Government also argues that the assessment of underpayment interest was proper under *FleetBoston Fin. Corp. v. United States*, 483 F.3d 1345 (Fed. Cir. 2007). In *FleetBoston*, a corporate taxpayer overpaid its reported taxes for the 1984 and 1985 tax years. *Id*. at 1347. For both of those tax years, the taxpayer elected to credit the overpayment to the following year's tax liabilities. *Id*. The same pattern continued until 1991, when the taxpayer requested and received an overpayment refund. *Id*. The IRS subsequently determined that the taxpayer's 1984 and 1985 tax returns were deficient. *Id*. at 1347–48. Although the taxpayer's overpayments exceeded the 1984 and 1985 deficiencies and were not needed to pay its taxes in subsequent tax years, the IRS nonetheless charged underpayment interest on the deficiencies. *Id*. at 1352–53. The taxpayer contested the interest charges, arguing that interest should not have been assessed, because sufficient funds to pay the deficiencies were already in the IRS's possession during the time periods at issue. *Id*. at 1348.

A majority of the Federal Circuit found that because the overpayments were designated "credit elect overpayments" these funds could not be credited to any later-determined deficiency for the year of the overpayment. *Id*. at 1353. Specifically, the *FleetBoston* majority relied on Section 6513(d) and 26 C.F.R. § 301.6402-3(a)(5), which provide that the IRS must treat and apply credit-elect overpayments as payment of the taxpayer's estimated taxes for the following year. *Id*. at 1349. The majority interpreted these provisions as providing that a "credit elect overpayment will be deemed to reside in the tax account for the succeeding year, even if it is not needed to pay estimated tax in that year." *Id*. at 1353. Because the taxpayer failed to show that "any overpayments of estimated tax or income tax for later tax years ever resided in its 1984 and 1985 tax accounts; those overpayments therefore never suspended the underpayment interest due for 1984 and 1985." *Id*. at 1354.

No. 20-30723

The *FleetBoston* dissent argued that under the use-of-money principle, underpayment interest does not accrue for any period the IRS possesses sufficient funds from the taxpayer to satisfy the later-determined deficiency. *Id.* at 1355–58 (Newman, J., dissenting). The dissent noted that the majority disregarded the fact that, throughout the period for which the IRS assessed underpayment interest, the IRS possessed funds belonging to the taxpayer in an amount exceeding the later-determined deficiency. *Id.* at 1355. The dissent further cautioned that the majority "diverge[d]" from statutory law and the rulings of *Avon* and its progeny by "establish[ing] a new rule that applies even when the overpayment was not needed and was not used to pay any tax obligation." *Id.*

We agree with the *FleetBoston* dissent. The *FleetBoston* majority was correct that Section 6513(d) and 26 C.F.R. § 301.6402-3(a)(5) provide that the IRS must treat and apply credit-elect overpayments as payment of the taxpayer's estimated taxes for the following year. However, as discussed above, these provisions do not address the IRS's ability to charge § 6601(a) underpayment interest on a later-determined deficiency during periods where it has use of enough credit-elect overpayment funds to satisfy that deficiency.

Further, like the *FleetBoston* majority, the Government's argument in this case fixates on theoretical migration of credit-elect overpayment funds from one tax year to another. *See* 26 U.S.C. § 6513(d); 26 C.F.R. § 301.6402-3(a)(5) However, this argument completely ignores the simple, undisputed fact that the IRS was never deprived of its use of the money the Goldrings lawfully owed it at any point during the five-year underpayment interest assessment period.

In the absence of clear statutory authority, we apply the established use-of-money principle and conclude that the IRS improperly assessed

16

underpayment interest against the Goldrings from April 16, 2012 to April 15, 2017. *Manning*, 338 U.S. at 566; *Avon*, 588 F.2d at 343–46. The Goldrings' summary judgment evidence shows that the IRS had continuous use of the Goldrings' credit-elect overpayment funds in an amount sufficient to satisfy the 2010 Deficiency throughout that five-year period. Accordingly, the Goldrings are entitled to a refund of the underpayment interest amount of $603,335.27.

## IV.

For the foregoing reasons, we AFFIRM the grant of the Government's first cross-motion for summary judgment and AFFIRM the denial of the Goldrings' first cross-motion for summary judgment.

We REVERSE the grant of the Government's second cross-motion for summary judgment, REVERSE the denial of the Goldrings' second cross-motion for summary judgment, and REMAND to the district court with an order to enter judgment for the Goldrings as to their claim for refund of the $603,335.27 underpayment interest amount.